SUPREME AUTO TRANSPORT LLC, et al.,

    Plaintiffs,

       v.

ARCELOR MITTAL, et al.,

    Defendants.

No. 08 CV 5468
Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiffs allege that domestic steel manufacturers reduced steel production in a concerted effort to drive up the price of steel. Direct purchasers of steel then passed on the higher prices to downstream customers like the plaintiffs, who bought consumer products made with steel as well as other materials. Plaintiffs filed suit against the defendants, the steel manufacturers, for the indirect harm allegedly caused by the illegal reduction in supply. Defendants move to dismiss the amended class action complaint. [175].[1] For the following reasons, defendants' motion is granted.

## I.    Legal Standard

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) does not test the merits of a claim, but rather the sufficiency of the complaint. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). In deciding a 12(b)(6) motion, a court accepts all well-pleaded facts as true and draws all reasonable

---

[1] Bracketed numbers refer to entries on the district court docket.

inferences in favor of the plaintiff. *Id.* at 1521. To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). In addition to the complaint, a court may also consider documents attached to or referenced in the complaint. *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998) (quoting *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1249 (7th Cir.1994)). "A complaint should not be dismissed for failure to state [a] claim unless it appears beyond doubt that the plaintiff is unable to prove any set of facts which would entitle the plaintiff to relief." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 546 (2007).

## II. Facts

Plaintiff Supreme Auto Transport LLC, based in Michigan, and fifteen individual plaintiffs from ten states represent a purported class of indirect purchasers of steel products. In 2008, Supreme Auto filed suit as the sole plaintiff representing a purported class. The original complaint alleged that defendants orchestrated a scheme to artificially increase the price of steel through coordinated production cuts between January 2005 and September 2008. Plaintiffs filed an amended complaint adding the fifteen individual plaintiffs in April 2016.

Plaintiffs allege that defendants, who are among the largest producers of steel in the U.S. market, instituted a plan to improve "industry discipline" and increase both prices and profit in the United States steel market. At the forefront of this plan was Mittal Steel USA, the predecessor of defendant ArcelorMittal USA,

who allegedly orchestrated a concerted cutback in steel production with the other defendants. As a result of this illegal market restraint, the price of steel was substantially higher than defendants' cost of production, the domestic demand for steel was well in excess of defendants' production, and there was a shortage of steel on the U.S. market. Consequently, plaintiffs allege that the price of steel was artificially inflated and this additional cost was passed along from the direct purchasers of steel to the purchasers of a panoply of consumer products containing steel, including refrigerators, dishwashers, ovens, automobiles, air conditioner units, lawn mowers, and farm and construction equipment.

The first amended complaint contains three counts: (1) violation of state antitrust laws, (2) violation of state consumer protection and unfair competition laws, and (3) unjust enrichment claims under the common law of "each of the fifty states, excluding Ohio and Indiana, and including the District of Columbia."

Defendants now move to dismiss each of the counts.

## III. Analysis

### A. Article III Standing

To bring a claim in federal court, a plaintiff must suffer an injury in fact that is fairly traceable to the alleged conduct of the defendant and likely to be redressed by a favorable judicial decision. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016). The burden is on the plaintiff to establish all of these elements of Article III standing. *Id*. Defendants argue that plaintiffs have not established Article III standing in any states except those in which they reside, and

they urge this court to address plaintiffs' standing before addressing issues of class certification. Plaintiffs argue that the standing inquiry should be postponed until after matters of class certification have been decided.

Plaintiffs have met their individual Article III standing requirements. They properly alleged an injury in fact (payment of "supracompetitive" prices) that could be fairly traced to defendants' alleged scheme and that would be redressed by a favorable judicial decision. Whether Article III poses an obstacle to adjudicating this case as a class action should be evaluated later.[2] In *Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002), the Seventh Circuit said that "*once a class is properly certified,* statutory and Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs." *Payton*, 308 F.3d at 680 (emphasis added). In *Arreola v. Godinez,* the court addressed the question of standing before it addressed class certification; however, in that case it was the standing of the *individual named plaintiff* that was being addressed—no inquiry was being made into the named plaintiff's ability to serve as a class representative at that time. *Arreola v. Godinez*, 546 F.3d 788, 794–95 (7th Cir. 2008). For now, whether named plaintiffs can bring claims under the laws of other states and whether plaintiffs are adequate class representatives do not pose Article III barriers to subject-matter jurisdiction. *See Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011).

---

[2] Or not at all, if the complaint otherwise fails to state a claim as discussed below.

## B.    Antitrust Standing

In addition to Article III standing, an antitrust plaintiff must demonstrate antitrust standing at the pleading stage. Although general "harm" to the plaintiff is sufficient to satisfy the constitutional standing requirement, "the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016) (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983)). A range of doctrines attempt to spell out "the circumstances under which a particular party may recover from an antitrust violator." *Loeb Indus., Inc. v. Sumitomo Corp.,* 306 F.3d 469, 480 (7th Cir. 2002). These "antitrust standing" doctrines have arisen primarily under federal law. In *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 735 (1977), for example, the Supreme Court created a "direct purchaser" doctrine limiting treble damage actions under § 4 of the Clayton Act to direct purchasers, and in *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536–45 (1983) ("*AGC*"), the Court created a multi-factor "direct injury" doctrine to measure the link between the defendants' conduct and the plaintiffs' injury in a federal antitrust action. Those factors include "(1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment." *Loeb*, 306 F.3d at 484 (citing *AGC*, 459 U.S. at

537–45). The *Illinois Brick* direct-purchaser doctrine and the *AGC* direct-injury doctrine "are analytically distinct." *Int'l Bhd. of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 828 (7th Cir. 1999) (citing *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 476, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)).

The parties here focus their debate on (1) whether *AGC* is the governing test for each of the state-law antitrust claims and (2) if so, whether the first amended complaint in this case meets the multi-factor test laid out in *AGC*. I agree with defendants that *AGC* is the appropriate test in each of the states for which resident plaintiffs assert antitrust claims and that the complaint does not meet the *AGC* test.

### 1.    State Applications of the AGC Test

Plaintiffs point out that the Supreme Court did not address whether the *AGC* factors should govern questions of antitrust standing when plaintiffs bring state antitrust claims to federal court. Plaintiffs cite a different Supreme Court case, *California v. ARC America Corp.*, 490 U.S. 93 (1989), for the proposition that "standing to sue under state antitrust law is determined ***solely*** with reference to state law." Plaintiffs' Response, [188] at 13 (emphasis in original). This is an overstatement. Federal antitrust laws do not "expressly pre-empt state laws permitting indirect purchaser recovery" and federal antitrust laws serve "to supplement, not displace, state antitrust remedies." *ARC America*, 490 U.S. at 101–02. But the Supreme Court left open the possibility that states could choose to

follow *AGC* specifically or federal law generally, and defendants argue that the states at issue in this case have done so. I agree.

Plaintiffs assert state antitrust violations in twenty-one states.[3] Named plaintiffs reside in nine of the twenty-one states. In eight[4] of the nine named-plaintiff states, the state courts have adopted the *AGC* test or a modified version of it to determine antitrust standing. *See* Defendants' Appendix 4, [176-1] at 54–56. The remaining named-plaintiff state, Tennessee, has not said outright that it would apply *AGC* or something similar, but at least one Tennessee appellate court has suggested that it might do so. *See Tenn. Med. Ass'n v. BlueCross BlueShield of Tenn., Inc.*, 229 S.W.3d 304, 311 (Tenn. Ct. App. 2007).

Likewise, courts in ten[5] of the twelve states where no named plaintiffs reside apply the *AGC* test in antitrust standing cases. *See* Defendants' Appendix 4, [176-1] at 57–58. Without mentioning the *AGC* standard by name, Utah and West Virginia have also established that their courts shall look to federal law when interpreting antitrust statutes. Utah Code Ann. § 76-10-3118 (when construing the state's antitrust laws, Utah state courts "will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes"); W. Va. Code § 47-18-16 (state antitrust laws

---

[3] Arizona, California, the District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

[4] Arizona, California, Iowa, Kansas, Michigan, New York, North Carolina, and South Dakota.

[5] The District of Columbia, Maine, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, North Dakota, Vermont, and Wisconsin.

"shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes"); *Princeton Ins. Agency, Inc. v. Erie Ins. Co.*, 690 S.E.2d 587, 592 (W. Va. 2009) ("The Legislature has directed that where our state antitrust provisions track the Sherman Act's provisions, federal decisional law should be followed.").

Thus it is appropriate to apply the *AGC* analysis to each of the state antitrust claims, as all of the states at issue either formally apply *AGC* in their own state courts or have indicated that they would follow federal law on this point.

### 2. Applying the AGC Test to the First Amended Complaint

The complaint alleges that "[s]teel products competition was restrained, suppressed, and eliminated" in violation of state antitrust laws; "[s]teel products prices were raised, fixed, maintained and stabilized at artificially high levels"; defendants "intended and knew that their combination, collusion, and conspiracy affected indirect purchasers of steel as well as direct purchasers"; plaintiffs were "deprived of free and open competitions"; and plaintiffs "paid supra-competitive, artificially inflated prices for Steel products" because price increases in raw steel are often passed on to indirect purchasers, who may bear the brunt of such a scheme. Plaintiffs argue that these allegations describe an injury that is "inextricably intertwined" with defendants' alleged restriction of the steel market. Plaintiffs also contend that their injury is not speculative, as it can be calculated by tracking the illegal overcharges that were passed on through the distribution line to the customer.

This narrative is deficient. Most notably, *AGC* factors 1 (causal connection), 4 (directness of the injury), and 5 (non-speculative damages), all point toward no applicable injury here. Although plaintiffs make conclusory assertions about causal connections and the directness of the injury, the complaint does not acknowledge the role of interceding parties who purchased and distributed the raw steel from defendants or manufactured and sold the steel-containing consumer products that plaintiffs eventually purchased. Nor does the complaint provide any basis to infer a link between specific products and individual steel mills. It does not even identify whether the steel in these products came from defendants' steel mills at all. Plaintiffs' assertion that the steel is "identifiable" through the supply chain does not answer the question of whether, having isolated which parts of a product are made of steel, that steel can then be traced to a defendant's mill.

Plaintiffs do assert improper motive (*AGC* factor 2), arguing that defendants "intended and knew that their combination, collusion, and conspiracy affected indirect purchasers of steel as well as direct purchasers." Yet it is implausible to claim that defendants' motive was to inflate the price of steel-containing products they do not sell and from which they do not profit. *Iqbal*, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"). Finally, while plaintiffs do not have to provide a full account of damages in their complaint, *see* Fed. R. Civ. P. 54(c) (relief need not be demanded in the pleadings), the facts in the complaint and the various letters from suppliers and manufacturers which are

referenced in the complaint suggest that calculating damages for these plaintiffs would be a highly speculative task. The products that plaintiffs purchased contained a wide variety of materials, each of which influences the retail price and cannot easily be segregated and priced after the fact. *See Loeb*, 306 F.3d at 486 ("The fact that the [plaintiffs] here are further down the chain of copper users than others also will increase the economic complexity of apportioning damages.").

Two cases are especially instructive here. In *Aluminum Warehousing*, the court found that indirect purchasers of aluminum products had not plausibly established antitrust standing because the plaintiffs (consumers of aluminum-containing products such as beverages sold in aluminum cans) were not participants in the restrained aluminum market. *Aluminum Warehousing*, 833 F.3d at 161 ("[T]o suffer antitrust injury, the putative plaintiff must be a participant in [the defendant's] market . . . but sometimes the defendant will corrupt a separate market . . . in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target."). Though the indirect purchasers argued that they participated in the aluminum market by creating a demand for aluminum, the court rejected the contention that this attenuated relationship met the "inextricably intertwined" exception. *Id*. at 161–62. Additionally, the indirect aluminum purchasers' injuries were not "a necessary step" in carrying out the alleged anti-competitive conspiracy, but rather a "purely incidental byproduct of the alleged scheme." *Id*. at 162. The court noted that plaintiffs' approach "would limitlessly increase the universe of potential plaintiffs"

by imposing a simple but-for test to show proximate cause in antitrust standing cases. *Id*. Here, too, plaintiffs' participation in the steel market is remote at best and stretches the "inextricably intertwined" exception too far. Though they may have paid inflated prices for steel-containing products, the alleged scheme would have been just as effective from defendants' point of view if direct purchasers of steel paid supracompetitive prices for raw steel and never passed that cost on to consumers.

The Seventh Circuit took a similar approach in *Loeb*, which dealt with purchasers of scrap copper suing trading corporations for allegedly fixing the price of copper at artificially high levels. The court found that the scrap purchasers failed to meet the *AGC* factors, including the questions of causation and remoteness. *Loeb,* 306 F.3d 469. In part, this was because there were "more immediate victims . . . in a better position to maintain a treble damages action," which "diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general." *Id*. at 484 (citing *AGC*, 459 U.S. at 542). This is true to an even greater extent in this case. Whereas the *Loeb* plaintiffs did purchase raw copper, albeit scrap copper left over from the refining process, the indirect purchasers here are even further down the line, having purchased the steel only as a component part of complex, mixed material products like appliances and construction equipment. *Cf. In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, 2013 WL 4506000, at *14 (N.D. Ill. Aug. 23, 2013).

Because plaintiffs' injury is too remote from the alleged misconduct, their damages too speculative, and defendants' improper conduct not likely to be targeted toward downstream purchasers of mixed material retail products, I find that plaintiffs have not satisfied the *AGC* factors necessary to demonstrate antitrust standing. Plaintiffs' state antitrust claims are dismissed.

## C. Other State-Law Claims

Plaintiffs' remaining claims, pleading violations of state consumer fraud statutes and common law unjust enrichment, require a showing of proximate cause or damages legally caused by the defendants' conduct. In the case of the state consumer fraud claims, each of the states requires that a consumer fraud action demonstrate proximate cause—if not explicitly, then by implication by requiring plaintiffs to be injured as a result of defendants' wrongful conduct.[6] Plaintiffs cite no

---

[6] AS § 45.50.535 (authorizing anyone who has been injured as a result of a violation of AS § 45.50.471 to bring an action for damages); A.C.A. § 4-88-113 (authorizing Arkansas courts to restore unlawfully acquired money or real or personal property to consumers who were harmed by violators of this act); Cal. Bus. & Prof. Code § 17207 (directing courts to calculate civil penalties for violation of this act based on various aspects of the defendant's conduct); Colo. Rev. Stat. § 6-2-111 (authorizing any party injured by a violator of the act to recover damages); Del. Code Ann. 6 § 2524 (permitting "any person who has suffered damages as a result of the use or employment of any such unlawful acts or practices and submits proof to the satisfaction of the Court that that person has in fact been damaged" to seek remedies); District of Columbia Code § 28-3905 (requiring the Office of Adjudication to order redress or restitution from violators of the trade practices law to consumers injured by those unlawful trade practices); Florida Stat. § 501.207 (empowering courts to reimburse consumers found to have been damaged by violators of Florida's Deceptive and Unfair Trade Practices Act); Idaho Code § 48-607 (empowering courts to award damages or restitution to consumers harmed by violators of Idaho's Consumer Protection Act); Me. Rev. Stat. Ann. 5 §§ 213 (permitting the award of damages to any person who "suffers any loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful" by Maine's Unfair Trade Practices Act); Mass. Gen. Laws Ann. 93A § 9 (authorizing any person injured as a result of a violation of Massachusetts' Regulation of Business Practices for Consumers Protection Act to bring an action for damages); Mich. Comp. Laws § 445.911(3) (authorizing damages actions by

authority from these states to suggest that a plaintiff can pursue a claim without suffering legal injury, and proximate cause is how one identifies cognizable injuries. *See CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) ("The *term* 'proximate cause' is shorthand for a concept: Injuries have countless causes, and not all should give rise to legal liability."); *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992) (citing *AGC* in support of the concept that "proximate cause" broadly refers to "the judicial tools used to limit a person's responsibility for the consequences of that person's own acts"). The reasons behind plaintiffs' failure to meet the *AGC* factors equally apply to a proximate cause analysis. In particular, the presence of many intermediate parties along the supply chain, the commingling of steel with other materials during the manufacturing process, and the absence of plausible evidence of any link between specific products and defendants' steel mills means that the defendants did not legally cause the harm allegedly suffered.

---

persons injured "as a result of a violation of" the Michigan Consumer Protection Act); Montana Code § 30-14-133 (permitting "a consumer who suffers any ascertainable loss of money or property, real or personal, as a result of" a violation of Montana's Consumer Protection Act to recover damages); Nebraska's Uniform Deceptive Trade Practices Act (Neb. Rev. Stat. § 87-303) does not provide a private right of action for damages at all, *Reinbrecht v. Walgreen Co.*, 16 Neb. App. 108, 742 N.W.2d 243 (2007), and because the First Amended Complaint only seeks damages, which plaintiffs are not entitled to, the claim under Neb. Rev. Stat. § 87-303 fails to state a claim; Nevada Rev. Stat. Ann. § 598.0999 (empowering courts to award damages to victims of violators of Nevada's Deceptive Trade Practices Act); N.H. Rev. Stat. §§ 358-A:10 and 358-A:10-a (authorizing any person or class injured by a violation of New Hampshire's Regulation of Business Practices for Consumer Protection Act to bring an action for actual damages); New York Gen. Bus. Law § 349 (authorizing "any person who has been injured by reason of any violation of" this act to seek damages); North Carolina Gen. Stat. § 75-1.1, et seq. (authorizing any person who has been injured as a result of a violation of this act to seek damages); Vermont Stat. Ann. 9 § 2465 (authorizing anyone "who sustains damages or injury as a result of any violation of State antitrust laws, including section 2453 of this title" to sue for damages); and Wisconsin Stat. Ann. § 425.301, et seq. (authorizing any person who has been injured as a result of a violation of this act to seek damages).

Plaintiffs' primary counterargument is a conclusory statement that supracompetitive prices were a direct and proximate result of defendants' unlawful acts. This is a legal conclusion and, without more, cannot survive a motion to dismiss. Plaintiffs also argue that there is no "single case authority requiring an independent showing of 'proximate cause' where . . . all *AGC* factors are satisfied," but as discussed above, the *AGC* factors have not been satisfied. The consumer protection claim is dismissed.

In the context of unjust enrichment claims[7], the benefit conferred from plaintiff to defendant is the causal link between plaintiff's harm and defendant's misconduct. Here, plaintiffs argue that they paid inflated prices to retailers for steel products, generating profits that ultimately accrued to defendants. As discussed above, the intervening chain of manufacturing and distribution renders plaintiffs' injury too remote from defendants' alleged price-fixing scheme. Plaintiffs' inflated payments are not appropriately cognizable as benefits conferred upon the defendants—defendants' material benefits from the plaintiffs' purchases are too speculative. The unjust enrichment claims are also dismissed.

### D. Tolling of the Statutes of Limitations

Defendants argue that the claims by each of the new named plaintiffs are time barred. All fifteen new named plaintiffs first filed their claims on April 26, 2016, asserting violations of antitrust laws of eight states, consumer protection laws of six states, and common law of unjust enrichment in nine states. The statute of

---

[7] Plaintiffs allege violations of unjust enrichment statutes in all fifty states excluding Ohio and Indiana and including the District of Columbia.

limitations for these claims range from two to six years,[8] but plaintiffs' claims unquestionably accrued no later than September 24, 2008, when Supreme Auto's counsel filed the original complaint. Because the fifteen new named plaintiffs filed their claims more than seven years after the latest possible accrual date, their claims are barred unless they can show that they were properly tolled.

Plaintiffs argue that their new claims should be tolled under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), which says that a statute of limitations is tolled for purported class members when "class action status has been denied solely because of failure to demonstrate that 'the class is so numerous that joinder of all members is impracticable.'" *American Pipe*, 414 U.S. at 552–53. The parties' key dispute here is whether the new named plaintiffs were purported class members at the time of the original complaint. *See In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*, 2015 WL 3988488, at *24 (N.D. Ill. June 29, 2015)

---

[8] Ariz. Rev. Stat. Ann. § 44-1410(A) (antitrust statute of limitations ("SOL") period of 4 years); Cal. Bus & Prof. Code § 16750.1 (same); Iowa Code § 553.16 (same); Kan. Stat. Ann. § 60-512(2) (antitrust SOL of 3 years); Mich. Comp. Laws § 445.781 (antitrust SOL of 4 years); N.Y. Gen. Bus. Law § 340(5) (antitrust SOL of 4 years); N.C. Gen. Stat. § 75-16.2 (same); S.D. Codified Laws § 37-1-14.4 (same); Tenn. Code Ann. § 28-3-105(3) (same); Cal. Bus & Prof. Code § 16750.1 (consumer protection SOL of 4 years); Fla. Stat. § 95.11(3)(f) (same); Mich. Comp. Laws § 445.911(7) (consumer protection SOL of 6 years); Mont. Code Ann. § 27-2-211 (consumer protection SOL of 2 years); N.Y. C.P.L.R. 214(2) (consumer protection SOL of 3 years); N.C. Gen. Stat. § 75-16.2 (consumer protection SOL of 4 years); Ariz. Rev. Stat. Ann. § 12-550 (unjust enrichment SOL of 4 years); Fla. Stat. § 95.11(3)(k) (same); Iowa Code § 614.1(4) (unjust enrichment SOL of 5 years); Kan. Stat. Ann. § 60-512 (unjust enrichment SOL of 3 years); Mich. Comp. Laws § 600.5813 (unjust enrichment SOL of 6 years); Mont. Code Ann. § 27-2-202 (unjust enrichment SOL of 3 years); N.Y. C.P.L.R. 214(3) (same); N.C. Gen. Stat. § 1-52(1) (same); S.D. Codified Laws 15-2-13 (unjust enrichment SOL of 6 years); Tenn. Code Ann. § 28-3-105(3) (unjust enrichment SOL of 3 years).

(citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983) (a class action lawsuit tolls the statute of limitations only for "all putative class members.")).

Plaintiffs argue that they were included in the original alleged class, citing the unchanged class definition in both the original and amended complaints ("All persons and entities residing in the United States who, from January 1, 2005 to September 17, 2008, indirectly purchased steel products in the United States for their own use and not for resale." Compl., [1] at ¶ 26, Am. Compl., [152] at ¶ 33.). Yet the first amended complaint redefined "steel products" so completely that "purchasers of steel products" now describes an entirely different universe of plaintiffs.

The original complaint defined "steel products" to mean:

> any consumer steel product including but not limited to produced flat steel sheets and coils; galvanized steel products; tin mill products; steel plates; steel beams, rails and other structural shapes; steel bars and rods; steel wire and wire rod; steel pipes and other tubular products; and a variety of other products derived from raw steel.

Compl., [1] at ¶ 3.

By contrast, the first amended complaint redefined the same term to mean:

> any consumer steel product for end use and not for resale, including clothes washers, clothes dryers, refrigerators, freezers, dishwashers, microwave ovens, regular ovens, automobiles, semi-tractor trailers, farm and construction equipment, room air conditioner units, hot water heaters, snow blowers, barbeque grills, lawn mowers, and reinforcing bars used in patios, driveways, swimming pools and sidewalks.

Am. Compl., [152] at ¶ 3.

The amended definition implicates a new and broader set of putative class members than the original definition. Relatively few people purchase raw steel products in the industrial form described in the original complaint. The much larger number of individuals who have purchased one or more of the consumer products in the first amended complaint greatly expands the pool of putative class members and deprives defendants of their right to notice. *American Pipe*, 414 U.S. at 554 ("The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.") (citation omitted).

Plaintiffs argue that the downstream consumer products enumerated in the first amended complaint are "simply a subset" of the "variety of other products derived from raw steel" from the original complaint. In their reading, the putative class always included retail purchasers because this vague, all-encompassing phrase could be construed to include any product with steel parts deriving from defendants' steel mills. But the original complaint says nothing about products like refrigerators, farm equipment, and air conditioner units, which are "derived from raw steel" only in the loosest sense of the term. These are products in which steel is only one of many component materials, and the chain of manufacturing and distribution may be much longer and more complex than it would be with steel bars, rods, and pipes. Rather than a subset of the "variety of other products derived from raw steel," these newly added claims

belong to a separate category of steel-containing retail products that are much less closely linked and less easily traceable to defendants' steel mills.

If the phrase "a variety of other products derived from raw steel" could be construed as broadly as plaintiffs claim, the original complaint would have given defendants the task of preserving evidence and accumulating witnesses from a nearly unbounded universe of steel-containing products. Moreover, since the only named steel products in the original complaint are industrial tools that scarcely resemble the complex, mixed-material consumer products in the amended complaint, it seems especially unlikely that this definition of "other products" is a consistent reading of the original complaint.

Plaintiffs point out that the amended claims need only be "substantially similar" to the original claims, not identical, in order to merit tolling. *See In re Linerboard Antitrust Litig.*, 223 F.R.D. 335, 351 (E. D. Pa. 2004). But even by this standard, tolling is not appropriate. In this case, nearly eight years after filing the initial complaint, defendants would be forced to incorporate new and previously unidentified witnesses and evidence into their defense plan, including an entirely new crop of manufacturers, distributors and retailers across the country. Given this, the fifteen new plaintiffs' claims do not share even a "substantially similar" factual basis and legal nexus, and defendants would be unduly prejudiced by tolling.

The amended claim of Supreme Auto—the original plaintiff—was also not tolled by its original claim. During discovery based on the original complaint,

Supreme Auto represented to defendants that its claim was based solely on its purchase of $171.64 worth of steel tubing. Nearly six years later, after filing the amended complaint, Supreme Auto provided a supplementary interrogatory informing defendants for the first time that their claim is based on the purchase of two semi-trucks, each costing over $100,000, and noted that the steel tubing was no longer relevant because the "class definition no longer includes steel tubing." Aside from serving as evidence of how significantly the class definition has changed, this maneuver has left Supreme Auto in the same position as its co-plaintiffs. Michigan's four-year statute of limitations, which governs Supreme Auto's claims, has now expired on anything other than the initial steel tubing allegations. *See* Mich. Comp. Laws § 445.781. Like the fifteen new named plaintiffs, Supreme Auto's amended allegations do not warrant tolling and are thus untimely.

### E.    Relation Back of Amendments

Rule 15(c)(1)(B) provides that an amended pleading relates back to the original where "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c). The touchstone of whether an amendment relates back is whether the original complaint "gave the defendant enough notice of the nature and scope of the plaintiff's claim that he shouldn't have been surprised by the amplification of the allegations of the original complaint in the amended one." *Santamarina v. Sears, Roebuck & Co.,* 466 F.3d 570, 573 (7th Cir. 2006)

(citing *Tiller v. Atlantic Coast Line R. Co.*, 323 U.S. 574, 581 (1945)). Relation back is appropriate where the "two complaints refer to the same general set of facts" even though the amended one alleges "a different cause of action and legal theory from the original complaint." *Id.*

The amendment does not arise from the same conduct, transaction, or occurrence as the original pleading. Although the allegations of defendants' plot to reduce supply remain largely the same, the transactions at issue in the original complaint involved products made at defendants' steel mills, while those in the first amended complaint involved consumer products that are not manufactured or distributed by defendants. The transactions in the amended complaint were purchased in different states and with wholly different chains of production and distribution than the more limited transactions in the original complaint. Plaintiffs argue that the changed product definition is insignificant, citing *Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748 (7th Cir. 2005), which notes that "[i]dentity of the consumable is a detail." *Schorsch*, 417 F.3d at 750. But the consumables at issue in *Schorsch* were fundamentally unchanged except in terms of their function. Where the original complaint dealt with EEPROM chips in Hewlett-Packard toner or ink cartridges, the amended complaint substituted EEPROM chips in Hewlett-Packard drum kits. From the outset, the suit always involved EEPROM chips in Hewlett-Packard manufactured printers. The identity of the consumable was deemed insignificant in that context because the proposed change was so slight and did not fundamentally alter the product category at issue. Here, the change in product

definition was much more meaningful, as it abandoned entire categories from the old definition while introducing new ones and implicating a host of new witnesses and potential evidence. Unlike in *Schorsch*, the amendment in this case made extensive additions and substitutions to the consumable definition, vastly expanded the universe of potential plaintiffs, and would radically alter the scope and focus of discovery.

Allowing these amendments would deprive defendants of fair notice and create undue prejudice. Plaintiffs claim that defendants face no prejudice because the discovery process has just begun. But defendants had no reason to assume in 2008 that they should preserve or obtain discovery relating to the consumer products now at issue. Meanwhile, in the intervening years, evidence may have been destroyed or lost and witnesses' memories may have faded. Defendants also have an interest in certainty and finality that would not be served if an entirely new pool of plaintiffs were permitted to attach their claims to a nearly eight-year-old complaint. "At some point, defendants should have notice of who their adversaries are." *Leachman v. Beech Aircraft Corp.*, 694 F.2d 1301, 1309 (D.C. Cir. 1982).

Because none of plaintiffs' newly added claims relate back to the original complaint or qualify for *American Pipe* tolling, they are untimely and are dismissed.

## IV.    Conclusion

For the foregoing reasons, defendants' motion to dismiss [175] is granted.

ENTER:

Manish S. Shah
United States District Judge

Date: 3/3/2017